Eric Scott Johnston
In Pro Per
GENERAL DELIVERY
Scottsdale, AZ 85255
480-277-7893
capagg@live.com
@EricScottJohns

```
FILED ____ LODGED
RECEIVED ____ COPY
NOV 2 7 2017
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____HA_____ DEPUTY
```

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

In re:

Eric Scott Johnston,

    Plaintiff,

v.

Tom Wheeler, Mignon Clyburn, Jessica
Rosenworcel, Ajit Pai, Michael O'Reilley,
In their Official Capacities as Commissioners;
Federal Communications Commission

    Defendants, et. al

Case No.: CV-17-4306-PHX-DKD

**PETITION FOR INJUNCTION**

    Eric Scott Johnston respectfully petitions this Court pursuant to 42 U.S.C. §1983 et seq., the 1st, 10th and the 14th Amendments to the Constitution, to enjoin the Defendants, et al, the Commissioners of the Federal Communications Commission, hereinafter "THE FCC" from acting or voting on any measures that relate to or impact the current rule-set affecting the rights or privileges of internet service providers(ISPs) to tailor connection speeds. The concept shall be hereinafter referred to as "NET NEUTRALITY."

## ARGUMENT IN BRIEF

This petition advances the theory and argues the position that due to the ever-changing nature of the internet, it can no longer be regulated by the FCC because to do so would exceed the statutory boundaries of that Federal Agency as defined by 47 U.S.C. §151-154 et seq. because the internet's character has changed to such a degree that a ready definition of the internet, even a connection to it, can no longer be defined solely as a "tele-communications", or "information" entity.

## JURSIDICTIONAL STATEMENT

Plaintiff is a resident of Arizona and the claims presented herein make The United States Court, District of Arizona the proper venue and forum to adjudicate the claims presented herein.

Defendant's et al, The FCC, is a federal agency headquartered in Washington D.C.. Pursuant to Rule 4, Federal Rules of Civil Procedure, Plaintiff's geographical location and the Federal questions presented herein are sufficient to confer upon the Court jurisdiction over the Defendant(s) to adjudicate the claim(s).

## STANDING

Plaintiff is a Citizen of the United States of America. His claims relate to his Constitutional rights, and although Plaintiff is not an attorney, and the issues presented herein will conspicuously speak to the population at large, Plaintiff represents his interests solely in this Petition.

## INTRODUCTION

Not long ago the internet was referred to as "the information superhighway." While that analogy was applicable during the time it was coined, and was for many years afterwards, the nature of the internet, and the analogies thereto, can no longer be expressed with the sentiment the internet is akin to the roads we drive on, but rather, a more appropriate sentiment is to liken the internet to the "blood that runs through our veins."

This wide-spread adoption of the internet, at one time a convenient communication tool, has become so integrated into our lives, a reasonable argument can be made the choice of using or not using the internet no longer exists, and to interfere with its functioning as is, would

disrupt, and even jeopardize the lives of the people who rely upon it in ways that are too complex to calculate by the FCC. For the FCC to try and do so would run against the 1st and 10th Amendments to the U.S. Constitution because the nature of the internet has changed so much, that the FCC, in its planned vote on December 14th, would be regulating outside the scope of 47 U.S.C. §151-154 et seq., and in so doing would be running against the rights of the people and the various and several states that should be addressing the issue of Net Neutrality where it belongs, which is with Congress. Indeed, even the "advanced communications" definitions as codified in 47 U.S.C. §153 are inadequate to accurately depict the nature of the internet as it exists today.

Plaintiff wants to make it clear this Petition does not seek to affect or involve the Court in policy decisions in the FCC. For this reason, Plaintiff is advocating the FCC be enjoined from regulating the issue at all, and not just in a direction in Plaintiff's favor, however the obvious implication is the matter gets taken up in Congress.

## EVIDENCE SUPPORTING THIS PETITION

Plaintiff includes (Plaintiff's Ex. A) The written opinions The United States Court of Appeals, For the District of Columbia Circuit, No. 15-1063 Filed May 1st, 2017. Plaintiff's Ex. A is not submitted for its precedential value, but for its probative value as evidence because the dissenting and consensus views are not only so stark, but the angst between the views is so palpable, what is seen from both opinions is evidence that the issue of Net Neutrality needs to be addressed from the perspective of the private citizen (Plaintiff's Perspective) and not from the perspective of the ISP.

Plaintiff also included (Plaintiff Ex. B.), an op-ed piece written by FCC commissioner, Jessica Rosenworcel, stating, inter alia, the public commentary regarding the proposed FCC action is corrupt, and Plaintiff is very concerned that his voice is not, or cannot be, considered via the normal process of public input before the FCC takes action. Plaintiff concedes that op-ed pieces are not evidence per se, but that evidence can be obtained in the form of testimony supporting Plaintiff's 14th Amendment claim.

From these two evidentiary bases, Plaintiff has adequate cause and sufficient grounds for this Petition.

## TIMELINESS OF PETITION

This Petition is timely. The confirmation by Commissioner Rosenworcel in her op-ed piece indicated a 14th Amendment issue is at stake and the Chairman, Ajit Pai of the FCC, clearly intends to proceed on measures affecting Plaintiff's rights despite serious questions concerning the legitimacy of the public input process. Plaintiff notes that because the Notice requirements will not yet run out before the FCC plans to take the issue up, an emergency TRO motion will be forthcoming shortly after this Petition is filed to preserve the case and the legal issues presented.

## CONSPICUOUS LACK OF CASELAW

When Plaintiff did his initial research in drafting this Petition it became quite clear that although there is plenty of caselaw regarding First-Amendment issues from the standpoint of the private citizen, there is virtually no caselaw that speaks to the First-Amendment rights on the issues presented herein. There will be an obvious lack of caselaw in this claim. Plaintiff asserts he will be relying more on American philosophy to adjudicate this claim using the guidance of the Constitution, Statutory and Common law to determine the merits of the issues presented herein.

## A FRAMEWORK OF REASONING

While this Petition will introduce novel legal concepts, the issues presented are from the perspective of the private citizen in regards to 1st, 10th, and 14th Amendment rights preservation in a digital age where the law is being outpaced by technology, and not only from a technological advancement standpoint, but our inability to define it. This Court need not necessarily adjudicate the novel issues presented but rather determine if the issues themselves fall outside the statutory boundaries the FCC is permitted to operate under. The concepts present to illustrate what the internet is, versus what the internet was even a short time ago. Plaintiff has done his level best to advance these arguments without tautologies but concedes some of the arguments require rhetoric, not because rhetoric is an effective tool in a legal argument but because the nature of the internet is so far beyond what we can readily define, rhetoric is one of the only tools available to flesh out

the concepts presented herein. To wit, the internet is no longer just a convenience, it's no longer just a communications medium and the Congress convened in 1934 is very apt to handle it.

## THE EXAMPLE

About two-years ago ride-sharing technology and the companies that developed it were facing challenges; legally and logistically here in Arizona, and beyond. The obvious implication was the ride-sharing services were disrupting the market to a degree the taxi companies enjoying the economic benefits of being the "go-to transportation service" for the average citizen were seeing shrinking profits, and naturally, sought to preserve their market share. They were, mostly unsuccessful as the verve of the people adopted the rideshare technology quite readily. Today, the number of taxi-cabs here in the Phoenix-Metro has shrunk to an all-time low that it's almost strange to see them, when one is spotted at all.

The example here is simple and this framework will be used for the proceeding legal arguments: Imagine a new state-level administration is elected in Arizona that is against ride-sharing technologies. The agency that regulates transportation in Arizona is the Department of Weights and Measures. The chief bureaucrat for that department caps the number of ride-sharing vehicles to an arbitrary number to make it a more equitable playing ground for the taxi cabs, and to foster competition. But here is the problem. The taxi companies have already sold off their taxi fleets and no longer have the infrastructure to meet the demand created by capping the number of ride-sharing vehicles. Before the taxi-companies can rebuild their fleet numbers there is a lag of time that puts the population at significant risk of harm. It's Saturday morning and 2:00am rolls around and people are seeking transportation home to avoid driving while intoxicated. But there aren't enough taxis or ride-share vehicles during this time of rebuild. Due to the limited transportation options, there is an incentive to drive drunk that was not anticipated by the well-intentioned capping of ride-sharing vehicles.

This well-known example is how technology begins as a convenient tool (ride-sharing services) but becomes the standard when the existing service (taxi cabs) infrastructure is so diminished unanticipated second-order problems occur because the nature of the transportation business was not fully understood in its modern form.

## FIRST AMENDMENT ISSUES FROM THE STANDPOINT OF THE PRIVATE CITIZEN

The statutory boundaries of the FCC as defined by 47 U.S.C. §151 encompass a broad array of functions. Because the array of functions granted by 47 U.S.C. §151 are so broad, legal challenges regarding its jurisdictional boundaries are difficult to sustain to say the least, and more often than not, foolhardy. Plaintiff is aware of the broad FCC authority but after careful consideration Plaintiff believes it is more than clear the FCC would still act outside it's very broad scope of statutory authority if it enters upon the question to de-regulate any rule-set that regarding Net Neutrality.

A First Amendment consideration is the most obvious ramification deregulating Net Neutrality would have, and Plaintiff believes this Petition could turn on this argument alone. While it is true First Amendment issues are no stranger to legal challenges involving the FCC as the airwaves and/or the wires they are transmitted along are well within the FCC purview, but what of the printed press? There is nothing the statutory scheme codified by 47 U.S.C. §151 that even remotely allows the FCC to regulate free speech in print form. And yet…

One of the infrastructure changes the internet has achieved is that we receive the vast majority of our news and other information about our interests digitally. The adoption of digital information/news consumption has caused the production of the ink-and-paper news infrastructure to shrink, in much the same way taxi-cab numbers have. So that first novel legal concept is: *Is it impossible to separate free speech as it is understood in the First Amendment from the internet from the perspective of the private citizen?* Or, to be more succinct, *Does internet speed equal free speech?*

Plaintiff contends if the FCC enters upon the question of Net Neutrality and ISP's are allowed to limit the speed, or access altogether, of specific news and information organizations delivering digital content based upon how much money is paid to the ISP, and the paper-and-ink infrastructure is not able to compensate for the loss of digital news/information to ensure the First Amendment remains reasonably intact, the FCC is acting outside of its statutory boundary because of the effects deregulating Net Neutrality will put the FCC on par with Congress.

Plaintiff also contends that the Court need not adjudicate the issue of: does internet speed equal free speech, but rather, is the FCC statutorily authorized to determine that issue for us in the first place? When the FCC enters upon that question on December 14th, they will be.

While Plaintiff does not want to get into a lengthy argument about legislative intent when codifying 47 U.S.C. §151, it is a reasonable presumption Congress did so during a period when the paper-and-ink infrastructure was in a very different state than it is today and did not anticipate the effect the internet would have on shrinking the free press, in its paper-and-ink form, or even in television..

Plaintiff is a former technology analyst, turned novelist. He also makes extra-cash as a ride-share driver. (more on that below) And, Plaintiff also has experience arguing complex litigation in Federal Court. From the confluence of these experiences Plaintiff comes to Court with a different perspective than that of the company who brings a first-amendment argument, the type that may seem noble but in the background the scent of millions of dollars hangs redolent poised to eclipse the first-amendment rights of the private citizen pernicious. Here, Plaintiff is a private citizen who does not have millions of dollars hanging in the balance, he has, like that of every other private citizen, something much more at stake.

During Plaintiff's time as a tech analyst one of his areas of focus revolved around how the nature of technology applications were undergoing a paradigm shift from stand-alone, install and forget software, to cloud-based software that requires a subscription to access and use on a continuous basis. This software-as-a-service, or Saas, in the tech world, is now the standard for such applications such as Microsoft Word, Adobe's Photoshop, and many, if not the majority of applications that now require a pay-as-you-go fee.

This paradigm shift in the way we use and pay for software applications is very similar to the way the internet based news industry now runs their business models; as a paid subscription. Now the obvious should be stated that people have subscribed to their print-and-ink news services for decades now, even long before the internet came about. In fact, it is easy to conclude that the newspaper delivery person would stop delivering the print-and-ink news if a payment wasn't made. The difference and very important distinguishing factor here is the ISP's never had

the ability to say to the delivery people, "hey deliver your news, but we're going to cap your delivery speed limit at one-mile-per-hour." Of course, if there was some government agency that could have capped the speed at which news is delivered in the pre-internet era, this issue would be well-steeped in case law by now, that is from the perspective of the citizen.

As long as the infrastructure of the print-and-ink news industry remains in the same state as the taxicab industry does, the First Amendment rights of Plaintiff cannot be guaranteed if there is even the slightest hint a threat to the speed at which news and information can be delivered and accessed exists. Plaintiff does not lay blame with the internet service providers for the state the print-and-ink news industry is any more than he blames the government for it. The transition occurred because of the verve of the people. Regardless of how the transition occurred, regardless of the money involved, Plaintiff feels very safe in stating that Congress never intended the First Amendment to be the; *First Amendment-as-a-service*.

## DEFINITIONS OF THE INTERNET EVADE

What is a television broadcast? What is a radio station? These questions may seem absurd and even child-like and it's arguable these questions have any place in a legal pleading. Obviously, one only needs to draw upon common knowledge to answer these questions and it is simple to conclude how the FCC would be acting within its statutory authority to regulate these entities or functions of transmission. But when the question is asked: 'what is the internet?' The immediate answer seems to be as difficult as defining life itself because any modern definition of the internet cannot be made without also including what it means to the people who use it. And when we start to define meaning, without a full appraisal of what the internet is, we exclude meaning to others.

It is also easy to define what the internet was fifteen-years ago, even ten-years ago. But really, what is the internet today? Can the Government offer a definition of what the internet is with any degree of certainty to ensure that definition not only describes what it is physically but depicts what it represents without descending into a quasi-technological-philosophical esoteric argument that the FCC is equipped to handle?

    Plaintiff asserts we need not come to any firm definition of the internet because we can't. The internet might physically be nothing more than a sophisticated network, just as the human body is nothing more than a collection of cells, but neither of those physical definitions is accurate to a degree we can regulate upon because to do so would be an act of the intransigent rendering the truth of its nature abrogate.

    Plaintiff asserts if a reasonable definition of what the internet is cannot be made, then it is impossible for the FCC, when it enters upon the question of Net Neutrality, to act within its statutory boundary when it convenes on December 14th, 2017 as the statutory boundary codified by 47 U.S.C. §151 makes no allowance to define the internet, perhaps the ISP's, but are not now the ISP's the veins that transmit our digital blood? Plaintiff asserts we need to look at this issue from that perspective. Moreover, the FCC may no longer be able to regulate ISP's at all anymore because a legitimate case can be made ISP's are not just providing an information service, or communications service any longer, but has become a de facto First Amendment bulwark.

    Besides, we cannot define the Internet by its components (i.e., Broadband, DSL, Wireless) and hope to derive meaning from that any more than we can define blood types and derive meaning from human life from that. The Internet, in its modern form, evades definition in much the same way Al Capone evaded the law. And if one thinks the analogy to be inept, the Communications act, passed in 1934 establishing the codification of 47 U.S.C. §151, was done in the same year when Capone began serving his 10-year sentence at Alcatraz. For the FCC to regulate the internet would be about as useful to sending people to Alcatraz, an institution *and* a law that no longer answers the problems of *our* time.

    The evidence as seen in Plaintiff's exhibit A show that some of our best and brightest legal minds cannot come to a firm definition on the implications of regulating the internet, or what it now means to do so, and Plaintiff asserts neither can the FCC. Plaintiff requests the Government, when it responds to this Petition, respond with a definition that does better than the Judiciary did in Ex. A so that it is clear the FCC is still regulating within its statutory boundaries. If the FCC cannot adequately define the internet, the FCC cannot regulate it.

## __INTERNET CONNECTIONS CAN NO LONGER BE CLASSIFIED AS AN INFORMATION SERVICE OR A TELECOMMUNICATIONS SERVICE__

Rideshare technologies such as Uber and Lyft, *inter alia*, depend on the internet to carry out their business of transporting human beings from one destination to another. To get right to the point, the FCC and its statutory scheme it operates under, cannot classify the transportation of human beings as a "telecommunications" or "information" service, which are the only classifications the FCC is statutorily authorized to make. But the FCC, given its abilities to abrogate the rule-set regarding Net Neutrality, is effectively regulating the transportation of human beings now. Moreover, this would not be the *only* industry the FCC would be back-door regulating indeed.

While an argument could still theoretically be made that ride-share technologies like Uber and Lyft still operate under an information-esque system, this is the equivalent of doing legal calculus, when algebra is needed, as the type of argument would be so discrete any made thereto would be meaningless as one only needs to stand on the Corner of Mill Ave and Fifth street in Tempe, Arizona and watch the driverless cars go by to get a very strange sensation and feel the question well-up that asks: What's coming down the road, both figuratively *and* literally? (Tempe, Arizona is one of the cities companies like Uber and Waymo are testing their driverless cars and are *currently* picking-up passengers in them.)

Plaintiff is a part-time rideshare driver for. Plaintiff takes issue with the notion that when he drives as a ride-share driver that he is in either the "information" or the "telecommunications" business. An ISP could theoretically throttle internet speeds or discriminate against Rideshare companies and make customers wait, or not receive these services at all thus affecting his livelihood without any form of proper redress. Will rideshare drivers, having no other form of redress, need to pay the ISP's on behalf of their customers to make sure they stay in business?

Not only is Plaintiff concerned about the ability for an ISP to take away his earning potential, the regulation of taxi's and ride-share vehicles is a State-level matter, and not a federal one. For the FCC to take any action on Net Neutrality and allow an ISP to encroach upon a State's regulatory authority of how it's residents are transported (and tax revenue benefits

enjoyed therefrom) because of an arbitrary notion such as this ISP doesn't like rideshare company because "fill in the blank."

This is very much a 10th Amendment argument, but Plaintiff doesn't have standing to bring that issue independently as that would need to be brought by the respective AG of the State that does take issue with it. It is here to support Plaintiff's overall argument the FCC is well-outside its statutory bounds, Congressional Intent, against public opinion, the Opinion of the Washington DC Court of Appeals when it denied review hearing En Banc. (See Pl. Ex. A, Although that case has no, or little applicability here as the First Amendment issues raised in that case were First Amendment issues from the perspectives of the ISP's and not a private citizen.)

## CONCLUSION AND PRAYER FOR RELIEF

Because the infrastructure of the print-and-ink news industry is no longer in the state it was during the enactment of the Telecommunications Act in 1934, and because Plaintiff, and citizens alike, cannot reasonably anticipate the level of access to news and information equal to what citizens enjoyed in a pre-internet era, the FCC must be enjoined from voting or taking any action of the issue of Net Neutrality. An injunction against the commission from deregulating or regulating on the issue further will require Congress to take it up, which is where Plaintiff asserts the issue belongs.

Because the internet cannot be defined adequately, the internet cannot regulated sufficiently by its constituent components, i.e., ISP's, anymore without risk of grave and serious damage to the entire digital organism known as the internet becuase the lives and livelihood of Plaintiff and citizens alike who are connected to it depend on it the way a person depends on blood for survival.

Because industries like, "transportation" services can never be considered "information" or "telecommunications" services, the FCC would be inadvertently regulating those industries through the back door. Moreover, Evidence exists suggesting Plaintiff's 14th Amendment rights have been compromised in the public commentary process leading up to the proposed action of the FCC regarding Net Neutrality.

WHEREFORE, Plaintiff respectfully Requests this Honorable Court:

    1.) Issue an immediate ORDER enjoining the Defendants, et al, of the Federal Communication Commission, in their official capacities, from voting or taking any action regarding the issue of Net Neutrality.

RESPECTFULLY SUBMITTED This 27 Day of November, 2017

Eric Scott Johnston<br>
In Pro Per<br>
GENERAL DELIVERY<br>
Scottsdale, AZ 85255<br>
480-277-7893<br>
capagg@live.com<br>
@EricScottJohns

PLAINTIFF'S EXHIBIT A

The Judicial Opinions of the Court of Appeals for the District of Columbia Circuit

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

FILED: MAY 1, 2017

No. 15-1063

UNITED STATES TELECOM ASSOCIATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

INDEPENDENT TELEPHONE & TELECOMMUNICATIONS
ALLIANCE, ET AL.,
INTERVENORS

---

Consolidated with 15-1078, 15-1086, 15-1090, 15-1091,
15-1092, 15-1095, 15-1099, 15-1117, 15-1128, 15-1151,
15-1164

---

On Petitions for Rehearing En Banc

---

Before: GARLAND*, *Chief Judge*; HENDERSON*, ROGERS, TATEL**, BROWN***, GRIFFITH, KAVANAUGH***, SRINIVASAN**, MILLETT, PILLARD*, and WILKINS, *Circuit Judges*.

2

## ORDER

The petitions for rehearing en banc, the responses thereto, and the brief of *amici curiae* were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to vote did not vote in favor of the petitions. Upon consideration of the foregoing, it is

**ORDERED** that the petitions be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:  /s/
Ken Meadows
Deputy Clerk

\* Chief Judge Garland and Circuit Judges Henderson and Pillard did not participate in this matter.

\*\* A statement by Circuit Judge Srinivasan, joined by Circuit Judge Tatel, concurring in the denial of the petitions, is attached.

\*\*\* Circuit Judges Brown and Kavanaugh would grant the petitions. Separate statements by Circuit Judge Brown and Circuit Judge Kavanaugh, dissenting from the denial of the petitions, are attached.

PLAINTIFF'S EXHIBIT B

An Op-ed Authored by Jessica Rosenworcel, Commissioner of the FCC

# Op-Ed I'm on the FCC. Please stop us from killing net neutrality



FCC commissioner Jessica Rosenworcel, center, alongside Chairman Ajit Pai, left, and commissioner Brendan Carr, right, during their confirmation hearing on Capitol Hill on July 19. (Chip Somodevilla / Getty Images)

By **Jessica Rosenworcel**

NOVEMBER 22, 2017, 4:10 PM

Right now, you can go online and connect with friends, watch videos and read the news. There's a good chance you are reading this online right now.

We do much more on the internet than consume content, however. Increasingly, the internet is also where we create. We use online platforms and digital services to develop, share and spread ideas around the corner and around the globe.

This is the open internet experience we all know, and it's a big part of why America's internet economy is the envy of the world.

But this week, the leadership at the Federal Communications Commission put forth a plan to gut the foundation of this openness. They have proposed to end net neutrality, and they are trying to force a vote on their plan on Dec. 14.

> # If the idea behind the plan is bad, the process for it has been even worse.

It's a lousy idea. And it deserves a heated response from the millions of Americans who work and create online every day.

Net neutrality is the right to go where you want and do what you want on the internet without your broadband provider getting in the way. It means your broadband provider can't block websites, throttle services or charge you premiums if you want to reach certain online content.

Proponents of wiping out these rules think that by allowing broadband providers more control and the ability to charge for premium access, it will spur investment. This is a dubious proposition.

Wiping out net neutrality would have big consequences. Without it, your broadband provider could carve internet access into fast and slow lanes, favoring the traffic of online platforms that have made special payments and consigning all others to a bumpy road. Your provider would have the power to choose which voices online to amplify and which to censor. The move could affect everything online, including the connections we make and the communities we create.

This is not the internet experience we know today. Americans should prevent the plan from becoming the law of the land.

There is something not right about a few unelected FCC officials making such vast determinations about the future of the internet. I'm not alone in thinking this. More than 22 million people have filed comments with the agency. They overwhelmingly want the FCC to preserve and protect net neutrality.

At the same time, there are real questions about who filed some of the net neutrality comments with the FCC. There are credible allegations that many of the comments were submitted by bots and others using the names of deceased people. What's more, some 50,000 recent consumer complaints appear to have gone missing.

As he announced this week, New York Atty. Gen. Eric Schneiderman has been investigating these apparently fake comments for six months. The Government Accountability Office is also looking into how a denial-of-service attack may have prevented people from getting their thoughts into the official record.

In short, this is a mess. If the idea behind the plan is bad, the process for commenting on it has been even worse.

Before my fellow FCC members vote to dismantle net neutrality, they need to get out from behind their desks and computers and speak to the public directly. The FCC needs to hold hearings around the country to get a better sense of how the public feels about the proposal.

When they do this, they will likely find that, outside of a cadre of high-paid lobbyists and lawyers in Washington, there isn't a constituency that likes this proposal. In fact, the FCC will probably discover that they have angered the public and caused them to question just whom the agency works for.

I think the FCC needs to work for the public, and therefore that this proposal needs to be slowed down and eventually stopped. In the time before the agency votes, anyone who agrees should do something old-fashioned: Make a ruckus.

Reach out to the rest of the FCC now. Tell them they can't take away internet openness without a fight.

*Jessica Rosenworcel is a member of the Federal Communications Commission.*

**Follow the Opinion section on Twitter @latimesopinion or Facebook**

**ALSO**

**David Lazarus: Trump administration, in a gift to telecom firms, is pulling the plug on net neutrality**

**Michael Hiltzik: The FCC's abandonment of network neutrality will end the internet as we know it**

**A brief, strange history of net neutrality (including a 'series of tubes,' a dingo and James Harden)**

Copyright © 2017, Los Angeles Times

**This article is related to:** Federal Communications Commission